United States Court of Appeals
Fifth Circuit

**F I L E D**

June 10, 2003

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

**No. 02-10866**
_____

**IN RE: TRI-CITY HEALTH CENTRE, INC.,**

**Debtor**

--------------------------------------

**RANDOLPH ROYAL GILLUM; TEXAS SUMMIT
CORPORATION; SURGERY & DIAGNOSIS INCORPORATED,**

**Appellants,**

**versus**

**ROBERT MILBANK, JR., Trustee for Tri-City
Health Centre, Inc.; UNITED STATES OF AMERICA,**

**Appellees.**

_____

Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
Civil Docket 01-CV-1352
_____

Before DAVIS, JONES, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Randolph R. Gillum, Texas Summitt Corporation ("TXS"), and Surgery & Diagnosis Incorporated ("SDI") appeal from the district court's affirmance of the bankruptcy court's judgment in favor of Tri-City Health Care Centre ("TCHC") on its breach of fiduciary duty and fraud claims and in favor of the United States of America on its claims under the False Claims Act, 31 U.S.C. § 3729 et seq. (2000). We hold that the bankruptcy court and district court erred in finding a settlement agreement to which Gillum, TXS, and TCHC were parties did not contain a release of the claims brought by TCHC in this case. We also hold that the bankruptcy court and district court did not err in finding sufficient evidence to support the verdict in favor of the Government on its claims under the False Claims Act. Therefore, we affirm in part, and reverse in part.

## BACKGROUND

TCHC filed for Chapter 11 bankruptcy protection on July 3, 1998. On August 11, 1999 TCHC initiated an adversary proceeding against Gillum, Karen Gillum, TXS, and SDI alleging that they breached their fiduciary duty to TCHC, were involved in a civil conspiracy, and were unjustly enriched by transactions between TCHC and TXS. TCHC also asserted a fraud claim against Gillum and TXS. On October 21, 1999, the United States of America ("Government"), on behalf of Medicare, intervened in the lawsuit against Defendants alleging violations of the False Claims Act ("FCA"), common law

2

fraud, and unjust enrichment. In October 2000, the bankruptcy proceeding was converted to a Chapter 7 liquidation and Robert Milbank, Jr. was appointed as Trustee and was substituted into the lawsuit on behalf of TCHC.

The claims of TCHC and the Government arise out of two sets of transactions between TCHC and TXS. At the times of these transactions, Gillum was TCHC's CEO and a member of its Board of Directors. During this time period, Gillum was also the sole shareholder and President of TXS (a subchapter S corporation).

The first transaction involves the sale of a CT Scan machine to TCHC in 1990. The CT Scan machine was purchased by TXS in 1988 and listed as an asset on its books; the documentation of the sale, however, identified SDI as the seller of the machine. TXS purchased the CT Scan machine for $145,000 and sold it to TCHC for $893,000, for a profit of $748,000. The second set of transactions relate to contracts wherein TCHC hired TXS to perform construction work between 1989 and 1994. While the construction only cost TXS $5,000,000 to perform, TXS charged TCHC over $12,000,000, resulting in a $7,000,000 profit for TXS. Gillum concedes that these profits were excessive and that his receipt of the profits (through TXS) constitutes a breach of fiduciary duty.

Before the bankruptcy court, Gillum argued that TCHC's claims were barred by the statute of limitations and that neither the discovery rule nor the doctrine of fraudulent concealment could

3

toll the running of the statute. Gillum also argued that TCHC had released any potential claims it had against him as both Gillum and TCHC were parties to a settlement agreement executed to resolve a suit brought by the Texas Attorney General ("AG") in 1993 alleging that Gillum, TCHC, and TXS, inter alia, "used the charitable assets of TCHC for private gain rather than for the exclusively charitable purposes permitted by Texas law." The AG's complaint included allegations related to the construction contracts and excessive rates charged by TXS as well as allegations related to the CT Scan machine transaction.

The Government's FCA claims also arise out of the CT Scan machine transaction and the construction contracts. The Government's claims are based upon the fact that TCHC's payments to TXS were reimbursed by Medicare. Because TXS and TCHC are related parties, TCHC was only entitled to receive reimbursements for its payments to TXS that covered TXS's costs in providing the goods and services. The Government alleged that TXS, Gillum, and SDI made false statements when they failed to disclose their costs related to these transactions to TCHC and then misled TCHC when TCHC was required to report TXS's and SDI's costs to Medicare since they were all related parties. The Government also alleged that Gillum, TXS, and TCHC made false claims themselves by submitting vouchers and invoices to TCHC for payment without disclosing the necessary cost information and then misleading TCHC as to their costs.

4

With the consent of the parties, the bankruptcy court held a jury trial on the Government's and TCHC's claims. The jury returned a verdict in favor of TCHC finding the defendants liable for breach of fiduciary duty and that Gillum and TXS had committed fraud, and civil conspiracy, and were unjustly enriched by the hospital. As to Gillum's statute of limitations defense, the jury concluded that TCHC neither knew nor should have known about its claims related to the CT Scan machine until April 30, 1998 and the construction contracts until March 30, 1999. Furthermore, the jury concluded that TCHC did not release its claims against Gillum and TXS as part of the settlement agreement with the AG.

The jury also found that Gillum, TXS, and SDI violated the False Claims Act because each had knowingly presented a false or fraudulent claim to Medicare; had knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid; and conspired to defraud the government by getting a false or fraudulent claim allowed. The jury found that Gillum, TXS, and SDI had committed common law fraud against the Government and that they acted with malice or willfulness as to the rights of the United States.

The bankruptcy court entered judgment in favor of TCHC against Gillum for $7,233,500 in actual damages, $668,051.18 in prejudgment interest, and $3,600,000 in punitive damages. Additionally, the court entered judgment in favor of the Government

5

against Gillum, TXS, and SDI, jointly and severally for $3,000,000 in actual and treble damages. Further, the court entered judgment in favor of the government in the amount of $1,198,500 against Gillum, $1,190,000 against TXS, and $8500 against SDI as statutory penalties for violating the FCA. The Defendants moved unsuccessfully for judgment as a matter of law or new trial. Gillum, TXS, and SDI appealed to the district court, which affirmed the judgment of the bankruptcy court.

## DISCUSSION

"Bankruptcy court rulings and decisions are reviewed by a court of appeals under the same standards employed by the district court hearing the appeal from bankruptcy court; conclusions of law are reviewed de novo, findings of fact are reviewed for clear error, and mixed questions of fact and law are reviewed de novo." Century Indem. Co. v. NGC Settlement Trust (In re National Gypsum Co.), 208 F.3d 498, 504 (5th Cir. 2000).

We review a district court's ruling on a motion for judgment as a matter of law de novo. Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs, Inc., 293 F.3d 912, 918 (5th Cir. 2002). Judgment as a matter of law is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). In reviewing denial of a motion for JMOL, the court must review the record "taken as a

6

whole." Phillips v. Monroe County, 311 F.3d 369, 373 (5th Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). In reviewing the evidence in the record, we must "draw all reasonable inferences in favor of the nonmoving party" and "not make credibility determinations or weigh the evidence." Id. (quoting Reeves, 530 U.S. at 150). The court "must give credence to the evidence supporting the nonmovant as well as any evidence supporting the moving party that is uncontradicted, unimpeached, and not attributable to interested witnesses." Id. The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151.

TCHC's Claims

Gillum argues that TCHC released the claims upon which it recovered in this case as part of a settlement agreement arising out of the AG's 1993 lawsuit against both parties. The AG's 1993 suit alleged that TCHC, TXS, and Gillum "used the charitable assets of TCHC for private gain rather than for the exclusively charitable purposes permitted by Texas law." The settlement agreement includes pre-printed and handwritten provisions. Paragraph 4 of the settlement agreement stated that

> The Parties agree to release, discharge, and forever hold the other harmless from any and all claims, demands or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted in the above case, as of this date, arising from or relating to the

7

events and transactions which are the subject matter of this case, ~~except for the following:~~ or alleged in any manner in connection with this case.[1]

The settlement agreement defines "party" as all named parties to the case. TCHC, TXS, and Gillum were all named as defendants in the AG's suit. In addition to this general release, there are also handwritten, specific releases of claims among Gillum, TXS, and TCHC.[2]

The bankruptcy court held that the settlement agreement was ambiguous as a matter of law because in its view the general release and the specific releases within the settlement agreement were contradictory. In light of its conclusion, the bankruptcy court allowed the jury to hear extrinsic evidence that the settlement agreement only intended to release the claims of the AG

---

[1]The strikeout appears in the original.

[2]There are nine handwritten paragraphs appended to the settlement agreement form. The first three paragraphs state that

1. Texas Summitt Corporation and/or Randolph R. Gillum, D.O. will agree to release to Tri-City Health Centre, Inc. all remaining claims for payment for construction and back management fees including fees owing to Texas MRI.

2. Randolph R. Gillum, D.O. and/or Texas Summitt Corporation will agree to release to Tri-City Health Centre, Inc. all claims for reimbursement for the hospital's use of aircraft.

3. Randolph R. Gillum, D.O. will agree to pay to Tri-City Health Centre, Inc. $100,000 and to pay to the Attorney General $30,000 on or before April 1, 1994.

8

against TCHC, Gillum, and TXS, but not any claims that might exist among TCHC, Gillum, and TXS. The jury found that TCHC did not release its claims against Gillum as part of the 1993 settlement agreement.

Gillum challenges the bankruptcy court's holding that the settlement agreement was ambiguous. To the contrary, Gillum argues that if correctly interpreted, the agreement provides that TCHC released Gillum from any claims arising out of the CT Scan transaction or the construction contracts. We agree with Gillum that the settlement agreement is not ambiguous and under its plain meaning TCHC released the claims it brought against Gillum in this case.

"Like any other agreement, a release is subject to the rules of construction governing contracts." Baty v. Protech Ins. Agency, 63 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2001, pet. denied). "A contract is ambiguous only if 'it is reasonably susceptible to more than one meaning.'" Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co., 174 F.3d 653, 657 (5th Cir. 1999) (quoting Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)). Parol or extrinsic evidence may not be used to create an ambiguity; it may be used to interpret a contract only where the court first determines that the contract is in fact ambiguous. Leasehold Expense Recovery, Inc. v. Mothers Work, Inc., 2003 WL 21136731, at

*5 (5th Cir. May 19, 2003);  <u>Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.</u>, 907 S.W.2d 517, 520 (Tex. 1995).

The settlement agreement explicitly states that the parties to the agreement, which included TCHC, Gillum, and TXS, release all claims arising out of the events and transaction which were the subject matter of the AG's suit.  The petition filed by the AG included allegations of wrongdoing by TXS and TCHC related to the CT Scan transaction and the construction contracts at issue in this case.  Thus, the settlement agreement on its face plainly constitutes a release by TCHC in favor of TXS and Gillum on the claims brought by TCHC in this case.

TCHC makes two arguments supporting an ambiguity in the language of the settlement agreement.  TCHC first argues that the settlement agreement is ambiguous because reading the general release to cover all claims between TCHC and Gillum/TXS would render the specific release clauses meaningless.  Thus, to preserve the meaning of the specific releases, the general release could reasonably be construed only to release the AG's claims against Gillum, TCHC, and TXS but not the claims among Gillum, TCHC, and TXS.

This argument lacks merit.  It is certainly true that specific contractual terms control over the general terms. <u>O'Connor v. O'Connor</u>, 694 S.W.2d 152, 155 (Tex. App.–San Antonio 1985, writ ref'd n.r.e.).  But, it is also a fundamental principle

10

of contract interpretation that every clause of a contract is intended to have some effect. Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1413 (5th Cir. 1993) (citing Westwind Exploration, Inc. v. Homestate Sav. Ass'n, 696 S.W.2d 378 (Tex. 1985)). In this case, there is no conflict between the general and specific releases in the settlement agreement. The specific releases dispose of certain potential, specifically identified claims that TCHC could bring while the general release covers all other claims. While the general release covers the claims addressed in the specific releases, it does not render them a nullity.

To accept TCHC's argument would require this court to state that any settlement agreement which contains a general release followed by specific releases is ambiguous per se. This is wrong. There is nothing inherently ambiguous about a settlement agreement that contains both a general release of claims between parties and specific releases regarding some claims that would fall within the terms of the general release.

TCHC's second argument is that the settlement agreement was ambiguous based on the facts and circumstances present at the time the settlement agreement was executed. TCHC points out that TXS, Gillum, and TCHC presented a joint defense, were never adverse to one another, and never filed cross-claims against one-another. Further, there was never any discussion of releasing claims among

11

themselves during the pendency of the 1993 AG's suit.  Thus, TCHC concludes that the scope of the general release is ambiguous.

It is true that "whether a contract is ambiguous is a question of law for the court to decide by looking at the contract in light of the circumstances existing at the time the contract was entered into."  U.S. Quest, Ltd. v. Kimmons, 228 F.3d 399, 403 (5th Cir. 2000) (quoting Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 529 (Tex. 1987)).  The circumstances that TCHC calls to the court's attention, however, do not render the settlement agreement ambiguous.  "Where the contract language is clear and definite, the contract is not ambiguous and the court must apply the plain language as a matter of law."  Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines, 278 F.3d 494, 497 (5th Cir. 2002) (citing DeWitt County Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999)).  Here the language plainly releases TCHC's claims arising out of the CT Scan transaction and the construction contracts. That TCHC was not adverse to Gillum and TXS in 1993 with respect to the AG suit does not prove that the parties did not intend to release any claims they may have among one another arising out of the transactions at issue in the AG's suit.  In fact, the settlement agreement explicitly provides for Gillum and TXS releasing claims to TCHC.  The plain language is binding.

Since the 1993 settlement agreement constituted a release by TCHC of the claims it made against Gillum and TCHC in this case,

12

the bankruptcy court erred in finding the settlement agreement to be ambiguous and allowing the introduction of parol evidence to interpret the agreement. The entry of judgment in favor of TCHC must be reversed.[3]

Government's Claims

Gillum, TXS, and SDI challenge the sufficiency of the evidence supporting the jury's verdict that they knowingly caused to be presented to Medicare a false or fraudulent claim for payment in violation of 31 U.S.C. § 3729(a)(1) and that they knowingly, made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid by Medicare in violation of 31 U.S.C. § 3729(a)(2).[4] The FCA claims relate to the

---

[3] Since we hold that the judgment in favor of TCHC must be reversed based upon the settlement agreement, we need not reach whether the claims against Gillum and TXS were barred by the statute of limitations.

[4] (a) Any person who--
  (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
  (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
  (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
  ...
  is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a) (2000).

13

same CT Scan and construction transactions as TCHC's claims. At trial, the government adduced evidence of two different types of false claims: Medicare Cost Reports filed by TCHC from 1990-1996 and the accompanying HCFA 339 forms submitted by TCHC to Medicare and invoices submitted by TXS and SDI for CT Scan machine and the construction work provided by TXS. Having reviewed the briefs and the record, we find that there is sufficient evidence to support the verdict in favor of the government.

## CONCLUSION

For the foregoing reasons, we reverse and render judgment in favor of Gillum and TXS on TCHC's claims and we affirm the judgment for the United States.

**AFFIRMED IN PART, REVERSED IN PART.**

14